THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
VICTOR P. ACEVEDO, Defendant-Appellant.

First District (5th Division)    No. 61377

Opinion filed June 25, 1976.

106

James R. Streicker and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Kevin Sweeney, and Eugene J. Rudnik, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the murder of Wolfgang Ulrich and the voluntary manslaughter of Karl Ulrich, and was sentenced to terms of 14 to 30 years for the murder and 5 to 15 years for

the voluntary manslaughter, the sentences to run concurrently. On appeal, he contends that the trial court erred when it (1) admitted palm print cards and a lift impression photograph into evidence; (2) adjudged him guilty beyond a reasonable doubt; (3) allowed the State to make prejudicial closing and rebuttal arguments, and (4) accepted the jury's inconsistent verdicts of murder and voluntary manslaughter.

The following pertinent evidence was adduced at trial.

*For the State*

*Manfred Ulrich*

He is the brother of Karl and Wolfgang Ulrich. Karl was about five feet seven inches tall and weighed 195 pounds; Wolfgang was about five feet nine inches tall and weighed 160 pounds. On March 16, 1973, at about 2 a.m. he and his two brothers were walking northward on the west side of the 3700 block on North Clark Street in Chicago. As they passed the Grand Slam Lounge at 3740 they were assaulted by between five and seven men emerging from the lounge. A man wearing an orange coat grabbed him from behind, knocked him down and pounced on him. The man was between five feet seven and five feet eight inches tall. Wolfgang came to Manfred's aid and kicked the man with the orange jacket away from Manfred. Then a Spanish man a little over five feet tall fired four or five shots. Manfred did not see the man's face. Immediately thereafter, the police arrived on the scene. Wolfgang was found lying on the ground in front of the lounge, while Karl was found in front of the doorway just south of the lounge. Both subsequently died of the wounds they received during the incident. At the police station, Manfred identified the man in the orange coat in a lineup. Neither he nor his brothers accosted or grabbed anyone in the doorway to the lounge while they were passing.

*Santo Valez*

He left the lounge at 1:55 a.m. with Jose Rosado, a friend, and crossed Clark Street to enter Rosado's car. There were seven persons, including defendant, left in the lounge. About five minutes later, he saw Juan Chaparro, the manager of the lounge, locking the lounge's front door. The three Ulrich brothers approached and one of them asked Chaparro for a drink. Another, whom Valez identified as the only present survivor of the three, grabbed Chaparro by the shoulder, turned him around, and attempted to take the bag of money that he had with him. When someone screamed for help Valez got out of the car and recrossed Clark Street. As he reached the other side, he saw the Ulrichs start to fight with Angel Sanchez and Manuel Mendoza whom he had previously seen inside the lounge. The Ulrichs then started to push and hit defendant, who had been standing in front of the lounge watching the fight. Valez did not see any of the Ulrichs with a gun in his hand. Defendant fired three or four shots

with a gun, hitting Wolfgang Ulrich who was fighting with Sanchez and Mendosa, and then hitting Karl Ulrich who was fighting with defendant. After the shooting defendant crossed the street and ran south.

*Juan Chaparro*

He was the manager of the Grand Slam Lounge. Shortly before 2 a.m. he announced that the lounge was closing. Jose Rosado, Santo Valez, defendant, and two others then left. As Chaparro attempted to lock the front door of the lounge, a man approached him and asked if the lounge was closing. When Chaparro replied that it was, the man screamed something incomprehensible. Chaparro pulled the door shut, and the man left. No one touched Chaparro as he attempted to lock the front door, nor did anyone attempt to take the bag of money that he had with him. He heard a number of shots, but before he had a chance to turn around and see what had happened, the police arrived on the scene.

*Jose Rosado*

He left the Grand Slam Lounge with Santo Valez on March 16, 1973. After he had entered his car, he saw some people arguing in front of the lounge. He did not hear any shots. He saw defendant walk quickly past his car and turn south.

*Patrick Walsh*

He had been a Chicago police officer for four years. As he and his partner, Officer James Clarke, approached the Grand Slam Lounge at approximately 2 a.m. he saw a group of people standing in front of the lounge. He heard shots but he did not see who fired them. He and Clarke searched everyone in the group, but no weapons were found.

*James R. Clarke*

He had been a Chicago police officer for approximately four years. He substantially corroborated Walsh's testimony. In addition, he testified that no weapons were found on the two men wounded in the shooting. Later, Stanley Manjack found a gun under the right front wheel of Jose Rosado's car. Approximately ten feet away from where the gun was found, he and Officer Walsh found five live bullets. Later Officer Richard Gibbons, an evidence technician, arrived on the scene and emptied five expended shells, which Clarke inventoried, from the gun.

*Richard Gibbons*

He had been a Chicago police officer for about seven years and an evidence technician for about two years. At about 2:10 or 2:15 a.m., he arrived at the scene and photographed a gun and five bullets. He dusted them for fingerprints. He photographed some physical ridge impressions which appeared on the butt of the gun. He transposed these impressions onto a cellophane lift and recorded information concerning their recovery for later references. He also tagged the gun and emptied five expended shells which he gave to Officer Clarke along with the five live bullets.

Subsequently, he transported the gun, the lift, and the undeveloped film from the pictures he had taken to the crime laboratory for processing.

*Biaggio Panapinto*

He had been a Chicago police officer for about 16½ years. He arrested defendant on March 17, 1973. He estimated that defendant was approximately five feet two inches tall and weighed 150 pounds.

*Donald Stanley*

He had been a Chicago police officer for about 13½ years. On March 17, 1973, following defendant's arrest, he took fingerprints and palm prints of defendant's left hand. The prints were recorded on cards which he subsequently placed in an envelope and forwarded to the identification section.

*Pasqual Kulala*

He was a physician and pathologist. On March 16, 1973, he examined the bodies of Wolfgang and Karl Ulrich and recovered a bullet from each. Each of the bullets was placed in a separate envelope, then sealed, signed, and forwarded to the Cook County Coroner. In his opinion, the Ulrich brothers died from the bullet wounds they received.

*Donald Smith*

He was a Chicago police officer assigned to the identification unit. On March 16, 1973, he received the gun which had been found near the lounge and the two bullets recovered from the bodies of the Ulrich brothers. Based upon ballistic tests which he conducted, it was his opinion that the two bullets were fired by the gun found near the lounge.

*Hugh Granahan*

He was a Chicago police officer and had worked with the identification unit for 22 years. On March 16, 1973, he received the cellophane lift and photographs taken by Officer Gibbons in connection with this incident. Thereafter, he received palm print cards corresponding to the palm prints of Santo Valez, Jose Rosado, Angel Sanchez, Manuel Mendoza and defendant. He compared the photograph of the lifted palm print impression from the gun with the palm print cards and found at least 13 points of identity between the lift and defendant's left palm card. He determined that the impressions lifted from the gun were made by defendant and not by the other individuals. He explained that in comparing prints, 12 identical ridge characteristics are generally necessary to establish positive identification.

On November 20, 1973, he met Glen Gutsche, an associate of defense counsel Warren Wolfson, to permit Gutsche to examine the State's file including fingerprint and palm print cards for Valez, Rosado, Sanchez, Mendoza, and defendant, in the *Acevedo* case. He removed the file's contents, for Gutsche to examine. He did not verbally inform Gutsche of the existence of fingerprint and palm print cards other than those of

defendant, however. He provided photocopies of all documents that Gutsche requested.

*For defendant*
*Glen Gutsche*

He was an attorney and associate of defense counsel Warren Wolfson. During his inspection of the police file Granahan retained physical possession of the file and removed certain items. Granahan never showed him the palm print cards of Valez, Rosado, Sanchez, and Mendoza in the file. However, from various police reports, he was aware these individuals had been arrested and that their fingerprints and palm prints had been taken.

During the trial, defendant objected to the State's offer of the palm print cards of Valez, Rosado, Sanchez, and Mendoza into evidence, arguing that the State had never mentioned the existence of the cards in its answer to defendant's pretrial discovery motion. The court noted that defense counsel had notice of the existence of the cards and an opportunity to request them. To compensate for the technical violation, the court extended an opportunity to defense counsel to interview in advance any witnesses called by the State to testify concerning the cards. The trial court then permitted the cards to be introduced into evidence.

In its closing argument the State referred to the brothers, wives, fiancees, and sisters of the victims. Defendant did not object to the reference. In its rebuttal argument, the State disparaged defense counsel's tactics during the trial and closing argument, commented on the defendant's failure to call any expert witnesses to refute Officer Granahan's identification of the lifted impressions and personally assured the credibility of the State's witnesses. Defendant objected to all of these remarks. All of defendant's objections were sustained.

OPINION

■■■ Defendant contends that the trial court erred when it admitted palm print cards and a lift impression photograph into evidence. He first argues that he was surprised and prejudiced at trial by the State's offer of the palm print cards of Valez, Rosado, Sanchez and Mendoza into evidence. Supreme Court Rule 412 requires the State, upon written motion of defense counsel, to disclose any reports or statements resulting from scientific tests, experiments or comparisons which it has in its possession or control. (Ill. Rev. Stat. 1973, ch. 110A, par. 412(a)(iv).) However, the trial court has the discretion of allowing the introduction of physical evidence not disclosed to defendant by the State during discovery where there is no showing of surprise or prejudice. (*People v. Jones*, 13 Ill. App. 3d 684, 301 N.E.2d 85.) In similar instances of nondisclosure, the burden of showing surprise or prejudice has been

placed upon defendant. (*People v. Raby*, 40 Ill. 2d 392, 240 N.E.2d 595, *cert. denied*, 393 U.S. 1083, 21 L. Ed. 2d 776, 89 S. Ct. 867.) In the instant case, defense counsel knew that the men's fingerprints and palm prints had been taken prior to trial. Moreover, when the State offered the palm prints into evidence, the trial court, offered to permit defendant to interview in advance any witnesses called by the State to testify concerning the cards. Defendant did not avail himself of the trial court's offer. In addition, in view of the more direct palm print evidence linking defendant to the shooting, the admission of the cards into evidence had no substantial effect on the jury's determination of defendant's guilt. Under these circumstances, we fail to see how defendant was either prejudiced or surprised by the State's offer of the cards into evidence.

■■■ Defendant also argues that the State failed to prove a sufficient chain of possession for the introduction of the palm prints and the lift impression photograph into evidence. We note that the admission of several cards was not objected to at trial on these grounds and, therefore, we will not consider their admission reviewable in the appeal. (*People v. Polk*, 19 Ill. 2d 310, 167 N.E.2d 185.) As to the remaining cards and the photograph, in the absence of any indication of substitution, alteration, or tampering, reasonably protective techniques are sufficient to substantiate the chain. (*People v. Wrona*, 7 Ill. App. 3d 1, 286 N.E.2d 370.) In the instant case, there was no indication or suggestion that the palm print cards or the photograph of the lift impression were substituted, altered, or otherwise distorted. It is abundantly clear from the testimony of Officers Clarke, Gibbons, Stanley, Smith, Granahan and of Doctor Kulala that both the cards and the photograph were processed through normal police identification channels. For these reasons, we must reject defendant's initial contention that the palm print cards and the lift impression photograph were erroneously admitted.

■■ Defendant next contends that he was not proved guilty beyond a reasonable doubt. He argues that the State failed to prove his participation in the offense. Generally, this court will not substitute its judgment for that of a jury on questions involving the weight of the evidence unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Stringer*, 52 Ill. 2d 564, 289 N.E.2d 631.) In the instant case, there was positive testimony from Valez that defendant fired three or four shots with a gun during the fight. Manfred Ulrich testified that shots were fired by a Spanish man a little over five feet tall. Defendant's height was confirmed by Officer Panapinto, who estimated that he was approximately five feet two inches tall. Chaparro testified that he saw defendant leave the lounge just before the shooting. Rosado testified that he saw defendant fleeing just after the shooting. In addition to the positive and corroborative testimony of Valez, Ulrich, Panapinto,

Chaparro, and Rosado, there was scientific evidence linking defendant to the murder weapon. Officer Granahan testified that the impressions taken from the gun matched defendant's left palm print. We conclude that the State proved defendant's participation in the offense beyond a reasonable doubt.

■■ Defendant alternatively argues that even if his participation was established, the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Whether the use of force which results in death *was justified is* a question of fact for the jury, and we will not disturb its determination unless the evidence *is* so unreasonable, improbable or unsatisfactory as to support a reasonable doubt. (*People v. Muldrow*, 30 Ill. App. 3d 209, 332 N.E.2d 664.) In the instant case, the evidence does not establish that defendant reasonably believed that he was acting to prevent imminent death or great bodily harm as required by section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1). Valez testified that he did not see any of the Ulrich brothers with a gun in his hand at the time of the incident, and there was no other testimony indicating that the Ulrich brothers were armed. There was testimony, however, that both Wolfgang and Karl Ulrich were taller and heavier than defendant. That factor was one for the jury to consider in deciding whether defendant acted to prevent great bodily harm; however, we do not believe the jury's determination on that issue was so unreasonable as to suggest a reasonable doubt. (*People v. Benedik*, 56 Ill. 2d 306, 307 N.E.2d 382.) For these reasons we reject defendant's second contention.

■■ Defendant next contends that the State's closing and rebuttal arguments were prejudicial. At the outset, we cannot consider State references to members of the victims' families since any errors have been waived for purpose of this appeal by defendant's failure to object to them at trial. (*People v. Donald*, 29 Ill. 2d 283, 194 N.E.2d 227.) After carefully reviewing the remaining isolated references by the State to defense counsel's trial tactics and the prosecution's personal assurance of the credibility of the State's witnesses in light of both arguments in their entirety, we cannot say that they resulted in substantial prejudice to defendant sufficient to constitute reversible error. *People v. Nilsson*, 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied*, 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881; *People v. Stahl*, 26 Ill. 2d 403, 186 N.E.2d 349.

■■ Defendant finally contends that the jury verdicts of murder with respect to Wolfgang Ulrich and voluntary manslaughter with respect to Karl Ulrich were inconsistent. He argues that his state of mind with respect to the shooting of Wolfgang Ulrich could not have differed from his state of mind with respect to the shooting of Karl Ulrich. Verdicts which are logically inconsistent are allowed to stand if the elements of

each offense are different. ( *People v. Joyner*, 50 Ill. 2d 302, 278 N.E.2d 756.) The Criminal Code of 1961 requires a mental state in voluntary manslaughter different from that in murder. For voluntary manslaughter, the defendant must be acting under a sudden and intense passion resulting from a serious provocation or under an unreasonable belief that the killing is justified (Ill. Rev. Stat. 1973, ch. 38, par. 9—2), whereas, for murder, the defendant is not acting under any such passion or belief (Ill. Rev. Stat. 1973, ch. 38, par. 9—1). Here, defendant's relationship with respect to one of the victims was different from his relationship with respect to the other. According to Valez's testimony, he was fighting with Karl Ulrich while Sanchez and Mendoza were fighting with Wolfgang Ulrich. Under these circumstances, the jury had a rational evidentiary basis for concluding that defendant's state of mind with respect to the shooting of Karl Ulrich was different from his state of mind with respect to the shooting of Wolfgang Ulrich and, accordingly, for finding him guilty of the voluntary manslaughter of Karl and the murder of Wolfgang.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN and BARRETT, JJ., concur.