THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES DEES *et al.*, Defendants-Appellants.

First District (5th Division)    No. 62849

Opinion filed March 11, 1977.—Modified upon denial of rehearing April 15, 1977.

1014

Howard T. Savage and Patricia Unsinn, both of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Mary E. Dienes, and Leonard J. Wojtecki, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendants were convicted of murder and armed robbery, and each was sentenced to terms of 60 to 100 years. On appeal, defendants present the following issues: (1) whether their right to due process of law was violated by the State's failure to comply with discovery requests; (2) whether their right to remain silent was violated by the admission of testimony regarding the exercise of their fifth amendment right; (3) whether their fifth amendment right was again violated by the admission of statements elicited during custodial interrogation after their right to remain silent had been exercised; (4) whether West's right to a fair trial was violated by the State propounding questions to his alibi witness which implied the existence of facts it could not and did not intend to prove; (5) whether their right to a fair trial was denied when hearsay evidence received for the motion to suppress was also considered as proof of guilt; (6) whether their right to a fair trial was denied where the cross-examination of the State's witnesses was improperly restricted; (7) whether the State failed to prove defendants guilty beyond a reasonable doubt; and (8) whether the sentences imposed were excessive in light of the background and age of defendants.

Defendants moved to quash the arrests, to suppress physical evidence, and to suppress in-court identifications. By agreement of the parties, the motions were heard with the State's case in chief.

On May 21, 1972, during a robbery of a tool rental store in Chicago by two armed men, an employee (David Monte) was shot and killed. His brother (Donald), also an employee, testified that he heard a gun shot and, when he turned toward the front of the store, he saw David lying on the floor with Dees standing about five feet from him with a smoking gun in his hand. The other armed man (West) then pointed a gun at Donald and ordered the opening of the cash register. At that time, Dees was only four feet from Donald, and West was about two feet away and slightly to his right. The lighting was excellent from a combination of sunlight and fluorescent lighting. Dees took $200 to $300 from the cash drawer, and the three of them stood next to the register for about one minute—during which time Donald had an unobstructed view of their faces. West then told Donald to open a cabinet in an inner office. They walked to that office, where both defendants faced him as he took out his keys and opened the cabinet. Later, after getting some bank bags at their request, Donald observed both defendants face-to-face for about one minute. When they left, he called the police and, later that day, viewed 70-80

photos from which he identified defendants. He first viewed two mug books and about 10 photos on a bulletin board without making an identification. Then he was shown nine other photos, which he went through once without making identification, but on his second review of them he picked out West, and on the third perusal he identified Dees.

Donald stated that other persons were on the premises during the occurrence, but he observed only Craig James. The entire occurrence took 10 to 15 minutes and, within two hours thereafter, Donald gave descriptions of both defendants to the police. He admitted that during the preliminary hearing he had pointed to a spectator in court in an attempt to identify Dees, but stated he corrected himself immediately by actually identifying Dees.

Harrison Gray then testified that he was in the store, returning a rented tool, when he saw two persons behind the counter—one on the phone and the other with his back turned to Gray. He then saw two men enter the store and one of them, later identified by him as Dees, put a gun to the temple of the person on the phone, and the other went to the rear of the store. Someone said, "Hit the floor," and he did so and then heard a gun shot and saw the person on the phone fall to the floor. On the day prior to his testimony, he was shown nine or ten photos at the State's Attorney's office but was not told that photos of defendants were among them. He identified both defendants from those photos.

At this point during the trial, the prosecutor sought to file an amended list of numerous witnesses. He then stated that of this group he wished to call Brad Rothermel, the substance of whose testimony had been incorporated in the previously tendered report of Maurice Sykes, and three FBI agents who had participated in defendants' arrests. It appears that when the assistant State's Attorneys assigned to try the case had taken it over three weeks prior, the amended list was in their file, and they were under the impression that it had been filed and that the defense had received copies of the reports of three of those named who were FBI agents. Copies of the FBI documents were given to the defendants and, over their objection, the trial court allowed the amendment but only after offering defendants whatever delay they wished for the purposes of interview, investigation or any other means of preparation they deemed necessary.

Brad Rothermel, one of those on the amended list, initially stated that he had played basketball at George Williams College with the defendants at noon on May 21, 1972, but later in his testimony said it was on May 22 (the day after the occurrence) and not on May 21. Then, on May 23, he saw their pictures in the Chicago Tribune and called the local authorities. On May 26, a police officer showed him nine photographs—from which he identified both defendants.

The next witness was police officer McCabe, who testified that he spoke to Donald Monte at the store after the occurrence and later, at the police station, he showed him a group of about nine photos—from which Donald identified defendants. Donald also viewed two mug books and some photos on the bulletin board before he made the identifications. McCabe didn't know whether the mug books contained a photo of West and said that Donald had looked at the group of nine photos twice before identifying one of the defendants, and a third time before pointing out the other. After the identifications, McCabe went to Dees's home to arrest him but was told by his mother that he was not home and that she had not seen him. Later that evening, McCabe obtained arrest warrants for both but was unable to locate either of them.

McCabe also testified that after the shooting he was told by Kevin Gresham, Craig James, and Frederick Wright, who were in the store during the occurrence, that Dees and West were the offenders. The day after the shooting, a Mr. Bauer identified West, and a Ms. Smith pointed out Dees as having been standing in front of their place of business— which was located next to the tool rental store—shortly before noon on May 21. McCabe also said that the Mobile Crime Lab obtained fingerprints, but he didn't know what prints were obtained.

The next witness was Frank B. Watts, one of those on the amended list of witnesses who was an FBI agent. He testified that he participated in the arrest of West in Forest, Mississippi, on July 10, 1972, and after West was read his rights and before any question was put to him, West stated:

> "I know what you are looking for me for. I know I am being sought for the robbery of the Buzz and Brush Tool Rental Company in Chicago, Illinois. I don't want to discuss that matter because I feel I can—beat the rap."

The agents asked no questions concerning the occurrence but did begin to acquire background information, such as age, name and address—which West gave him—and when asked if he was employed in Mississippi under his true name, West replied, "No, under Victor Hughes."

John B. Rucker, Jr., another FBI agent on the amended list of witnesses, testified that he also participated in the arrest of West in Mississippi and, after he was given his rights and before any question was asked, West stated:

> "I know you got me. You got me in connection with the robbery of the Buzz and Brush Tool Rental Company in Chicago, Illinois. I don't have any desire to talk about it. I don't want to discuss the matter at all with you. In fact, I think I can beat the rap."

John H. Proctor, Jr., another FBI agent on the amended list, testified that he participated in the arrest of Dees on July 10, 1972, in Morton, Mississippi, and after he was read his rights, he stated that he did not wish

to make a statement and that thereafter the only questions asked were normal booking questions. Among his responses, he stated he was employed in Mississippi under the name of Charles Hughes.

The State then rested, and defendants' motions to quash and to suppress were denied.

For the defense, the mother of West testified that he was at home with her during the morning of May 21, 1972, and that when she left for church at 11:50 a.m. she spoke to him, and when she returned about 12:45 p.m. he was still in the house. Dees came in about 1 p.m., and he and her son left a short time later. Thereafter, she did not see or hear from him until after his arrest.

The mother of Dees testified that he was at home on the morning of May 21, 1972, and that she awakened him at 11 a.m. He came downstairs at 11:30 a.m. to speak to James and Loret Franklin, who had come to visit him. The Franklins left about 11:50 a.m., and her son left the house at about 12:30 p.m. When she was at the preliminary hearing, she heard and saw Donald Monte point out Rodney West in an attempt to identify her son. She did not see or hear from her son from the time he left her home at 12:30 p.m. on May 21, 1972, until his return to Chicago after his arrest.

After defendants were found guilty, West filed a motion in arrest of judgment and for a new trial, in which Dees joined. The motion was worded in general terms, with the only specific allegation being that they had not been proven guilty beyond a reasonable doubt. No other grounds were argued, and the motion was denied.

## Opinion

■■ The State contends that the first six of the eight issues presented on appeal by defendants were waived by the failure to specify those points in the motion for a new trial. During oral argument in this court, defendants agreed that the general language used in the motion had not raised those issues, but they nonetheless urge a relaxation of the waiver rule. The failure to specify alleged errors, including those of constitutional import, in a motion for a new trial constitutes a waiver of those issues, and they cannot be urged as a ground for reversal. (*People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.) However, the rule has been relaxed where an issue not specified in the motion for a new trial had in fact been brought to the attention of and ruled upon by the trial court and where the accused would have been prejudiced should his contention be established as well-founded. (*People v. Nunez* (1974), 24 Ill. App. 3d 163, 320 N.E.2d 462.) So, also, even though an issue was not presented to the trial court, plain errors or defects affecting substantial rights may be noticed under Supreme Court Rule 615(a). (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a); *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) It is

within the framework of the holdings in *Nunez* and *Pickett* that we consider the first six issues raised.

In the first of these, defendants contend that they were deprived of due process by the failure of the State to comply with their discovery demand. Some two years prior to trial, defendants had requested extensive discovery—including a list of all witnesses, statements and reports. After trial had commenced, the State sought to amend a list of witnesses it had filed to include Brad Rothermel, who had observed activities of defendants on the day after the occurrence, and three FBI agents to whom defendants had made statements. The defense had been in possession of a police report outlining the substance of Rothermel's testimony but had not been furnished, prior to trial, with either the substance of the oral statements, the FBI reports, or the *Miranda* waiver forms used by the agents. Neither were they provided with any report concerning fingerprints taken at the scene, nor had they been given the nine photographs from which Donald Monte and Gray had identified defendants. Each of these omissions was brought to the attention of the trial court by defendants.

■■■ Since the trial court was apprised of defendants' position, that they were prejudiced because of inability to properly prepare for trial—which, if established, would have denied them due process, the waiver rule will be relaxed as to this issue, although it was not specified in the motion for new trial. (*Nunez.*) Where the State has failed to comply with discovery requests prior to trial, it is within the sound discretion of the trial court to admit testimony of unlisted witnesses (*People v. Steel* (1972), 52 Ill. 2d 442, 288 N.E.2d 355) or unfurnished physical evidence (*People v. Acevedo* (1976), 40 Ill. App. 3d 105, 351 N.E.2d 359), and the admission of such evidence does not constitute error absent a showing by the accused of resulting prejudice and surprise (*e.g., People v. Raby* (1968), 40 Ill. 2d 392, 240 N.E.2d 595, *cert. denied*, 393 U.S. 1083, 21 L. Ed. 2d 776, 89 S. Ct. 867; *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529; *People v. Jones* (1973), 13 Ill. App. 3d 684, 301 N.E.2d 85). Surprise or prejudice is not established where defendant has failed to take advantage of an opportunity to interview the unlisted witness and to seek a continuance for preparation purposes (*Steel*), or has failed to show that a rebuttal witness could have been produced or the unlisted witness could have been impeached had preparation time been afforded (*Raby*), or would not seek a continuance after having had the opportunity to examine the unfurnished reports or physical evidence (*People v. Myers* (1974), 20 Ill. App. 3d 83, 312 N.E.2d 741; *Jones*).

Defendants attempt to distinguish each of the above cited cases as being factually different from the instant case. However, we find that their suggested distinctions do not militate against the application of the

above rules. They also refer us to *People v. Mourning* (1975), 27 Ill. App. 3d 414, 327 N.E.2d 279, for the proposition that different considerations are applicable where the State has acted in bad faith, which they contend is the fact here inasmuch as two years had elapsed between the submission of the discovery request and compliance by the State. In *Mourning*, the State presented a list of witnesses two days before trial and moved to amend this list on the day before trial to include a witness granted immunity that morning. Then, on the day of trial, a defense motion for a continuance was denied and defendant was granted only a short recess to "discover, investigate and to develop a strategy." The *Mourning* court held the recess to be manifestly insufficient in the light of the State's apparent bad faith, which was evident from the fact that it must have known the identity and whereabouts of the witness at the time the original list was filed. The implication in *Mourning* was that the State wished to keep the witness under wraps until a satisfactory immunity agreement was reached and, even then, the State failed to give the street address of the witness. From the record before us, it appears that the two assistant State's Attorneys who had been assigned to the case three weeks prior to trial assumed that their predecessors had filed the amended list, a copy of which was in their file, and that they did not learn otherwise until the trial had commenced. While we take a dim view of the transfer of cases from one assistant to another without a system to avoid the occurrence of such errors, under the circumstances here we do not believe the State's omission to be one of bad faith.

■■ Furthermore, the trial court allowed the amendment and admitted the testimony of the witnesses only after initially offering defendants a continuance of sufficient duration for interview, investigation or other necessary preparation, and the defense chose to proceed with the trial. The court renewed the offer each time one of the unlisted witnesses was called to the stand and, prior to the testimony of each, the defense perused related reports and chose to go ahead without a continuance. As defendants did not avail themselves of the opportunity of continuances, we find no error in the admission of the testimony of the witnesses named in the amended list. (See *People v. Adams* (1972), 8 Ill. App. 3d 62, 289 N.E.2d 53.) We conclude that there was no merit to defendants' first contention that they were deprived of due process because of the delayed compliance with their discovery request.

■■ Defendants next assert they were prejudiced by the State's failure to furnish the *Miranda* waiver forms used by the FBI agents, the nine photographs used for identification of defendants by the two occurrence witnesses which were erroneously admitted into evidence, and the report of the Crime Lab which was referred to during trial but was not admitted into evidence. The *Miranda* waiver forms had not been sent to the State in

advance but were brought to court by the agents. The State had intended to question the agents orally regarding the rights given defendants, but the defense objected and the State then sought to admit the waiver forms which were the *Miranda* warnings read to defendants. The trial court offered a continuance, which was declined. Thus, having perused the documents and having decided to proceed, the defense waived the State's failure to comply with discovery prior to trial. *Myers; Jones.*

■■ Concerning the nine photographs, we note that in *People v. Camel* (1973), 10 Ill. App. 3d 1022, 295 N.E.2d 270, *aff'd* (1974), 59 Ill. 2d 422, 322 N.E.2d 36, the court held that the failure to comply with discovery requests for a photo identification spread cannot be viewed as reversible error where an independent origin supports the in-court identification. Here, the record supports the trial court's finding that such an independent origin existed, based upon its belief that Donald Monte and Gray had sufficient opportunity for observations under adequate conditions and that the descriptions given of defendants substantially correlated to their physical appearance. We note also that defendants did not object to the admission of these photos into evidence. Under such circumstances, we do not find their admission to have been error.

■■ Concerning the Crime Lab report, we note that during West's cross-examination of Officer McCabe, he testified he had seen a report to the effect that fingerprints had been taken from the scene but that he did not know whose prints were found. The State maintained that they had been unaware of such a report prior to McCabe's testimony, and the court then ordered the State to inquire of the Mobile Crime Unit whether such a report was in existence. Thereafter, the subject was not again mentioned in the record, so it is unclear whether it was found to exist or, if found, whether it was tendered to the defense. Assuming it was not so tendered, the State is under no constitutional requirement to produce a complete and detailed accounting which encompasses all of the aspects of police investigation absent a showing by the defense that the document sought is both material and favorable to the defense. (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387; *Longstreet; People v. Bracy* (1973), 14 Ill. App. 3d 495, 302 N.E.2d 747. See also *Moore v. Illinois* (1972), 408 U.S. 786, 795, 33 L. Ed. 2d 706, 92 S. Ct. 2562.) There has been no showing here by West that the document would have been favorable to him. The motion for new trial provided the proper format to seek the court's aid to determine whether the evidence was indeed favorable, but defendants did not avail themselves of this opportunity and, because neither the report or its content is before us, we are unable to determine whether the plain error rule should be invoked.

■■■ Another contention of defendants is that their right to remain silent was violated by the admission of testimony by the FBI agents

regarding the exercise of their fifth amendment privilege. Because West objected to the admission of and moved to suppress his statement, the waiver rule will be relaxed as to him. (*Nunez.*) Dees neither objected to the admission of his exercise of the fifth amendment nor sought to suppress it; therefore, his contention is reviewable only under the plain error doctrine. (*Pickett.*) In support of their contention that the admission of their exercise of the fifth amendment right to remain silent was error, they refer us to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18; *People v. Hellemeyer* (1975), 28 Ill. App. 3d 491, 328 N.E.2d 626; *People v. Hughes* (1973), 11 Ill. App. 3d 224, 296 N.E.2d 643; and *People v. Woodall* (1970), 131 Ill. App. 2d 662, 264 N.E.2d 303. In each of these cases, however, the accused had either said nothing or stated simply that he did not wish to be questioned or to make a statement. They also cited *People v. Lampson* (1970), 129 Ill. App. 2d 72, 262 N.E.2d 601, in which the accused, when apprehended, stated that he did not wish to make a statement and that he wanted to speak to an attorney. As he and the arresting officer walked to the waiting patrol car, the officer said that defendant had been lucky that he hadn't been shot during the course of the chase. Defendant replied that he wished that he had been, as he was no good. Apparently the statement of the officer was viewed as a veiled probe, made after defendant had asserted that he did not wish to be asked any questions and, as a result, the court held the admission of the statement to have been a violation of *Miranda*. Here, the State contends that West's statement was admissible, as it was not one within the parameters of *Miranda*. We agree. An accused who speaks after hearing and understanding the *Miranda* warnings has chosen not to exercise his right to remain silent. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) The admission of statements made voluntarily after being apprised of one's rights is not within the ambit of the *Miranda* prohibition (*People v. Moore* (1971), 50 Ill. 2d 24, 276 N.E.2d 319; *People v. Hicks* (1970), 44 Ill. 2d 550, 256 N.E.2d 823, *cert. denied*, 400 U.S. 845, 27 L. Ed. 2d 81, 91 S. Ct. 90; *People v. Doss* (1970), 44 Ill. 2d 541, 256 N.E.2d 753), and a decision of the trial court as to the voluntariness of a defendant's statement will not be disturbed unless contrary to the manifest weight of the evidence (*Pittman*).

■■ In applying these rules in the instant case, it should be borne in mind that the motions to suppress the statements were heard in conjunction with the State's case in chief. The record is replete with comments of the trial judge that he was aware of his dual role as trier of ultimate fact and as trier of the motions to suppress, and that he segregated the testimony which he heard according to the facet of the proceeding for which it was competent. The evidence before us reveals

that West was read and understood his *Miranda* rights; that no question was pending when he stated that he knew why he was being sought; that he thought he could beat the rap; and that his statement about not wishing to discuss the matter was a part of the same utterance. The trial court found the "beating the rap" statement to have been given voluntarily and before the exercise of his fifth amendment right, and we find the record amply supports the trial court's determination. It should be noted that while the statement that the accused had cut off questioning would be inadmissible as trial evidence, it was properly before the court for the determination of the motion to suppress.

■■ Dees did not object to the agent's testimony that after the *Miranda* rights were read to him he stated that he did not wish to make a statement. Errors of constitutional dimension may be waived. (*People v. Etten* (1975), 29 Ill. App. 3d 842, 331 N.E.2d 270.) They may, however, be reviewed under the plain error doctrine. (*People v. Mitchell* (1975), 35 Ill. App. 3d 151, 341 N.E.2d 153; *People v. Mitchell* (1973), 12 Ill. App. 3d 960, 299 N.E.2d 472.) We cannot find this to be a case of plain error because the trial court, as trier of fact, is presumed to consider only competent evidence. Further, although defendants have referred us to a page reference in the record in an effort to establish that the court did, in fact, consider their exercise of the right to remain silent in determining their guilt, our study of the record satisfies us that this was not the case.

■■ Defendants also argue that the admission of inculpatory statements elicited from them during custodial interrogation subsequent to the exercise of their right to remain silent was error. After Dees had exercised his right to remain silent and West had cut off any interrogations subsequent to his initial statement, defendants were asked questions concerning background information for FBI form FD-302, which was produced at trial. According to the testimony of the agents, this form sought responses to what were termed as routine booking questions— including name, address, place of employment, name under which employed, social security number, educational background, and names of parents. Pursuant to these questions, defendants stated that they were employed under assumed names and West under a false social security number. West objected to the agent so testifying, but neither defendant moved for the suppression of the answers given to these questions. Thus, the issue can be noticed only under the plain error doctrine. (*Pickett.*) Defendants cited cases such as *Miranda, People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27, and *People v. Parnell* (1975), 31 Ill. App. 3d 627, 334 N.E.2d 403, for the propositions that no questions may be posed after the exercise of the right to remain silent, and that should any subsequent questioning occur all responses thereto are inadmissible. The State answers that the prohibition of *Miranda* does not apply to questions

posed and responses given as part of the booking process. (*People v. Fognini* (1970), 47 Ill. 2d 150, 152, 265 N.E.2d 133, *cert. denied*, 402 U.S. 911, 28 L. Ed. 2d 653, 91 S. Ct. 1389; *People v. Turner* (1971), 2 Ill. App. 3d 11, 275 N.E.2d 742.) In *Fognini*, our supreme court stated:

> "Although none of the *Miranda* warnings were given to the defendant and no hearing as to the voluntariness of this statement was held, this was not an in-custody interrogation as contemplated by the United States Supreme Court in *Miranda*. The preliminary questions asked an accused with respect to his name and address, which are part of the booking proceedings certainly do not amount to an interrogation in order to elicit incriminating testimony or admissions from the defendant." (47 Ill. 2d 150, 152, 265 N.E.2d 133, 134.)

Defendants seek to distinguish these cases by urging that the questions were asked for the purpose of gathering evidence of flight, rather than for general informational purposes. A similar allegation was presented in *State v. Jordan* (Mo. App. 1974), 506 S.W.2d 74. In that case, a social security card bearing the name and number of Jordan was found within 10 feet of the scene of the burglary. Jordan was arrested for that crime, advised of his rights under *Miranda*, exercised his right to remain silent, and then during the booking process his social security number was elicited from him. The *Jordan* court surveyed the decisions of numerous jurisdictions which have held booking questions do not constitute forbidden interrogation under *Miranda*, although at times inculpatory responses are received. The inculpatory remarks were held to be admissible where the booking questions met the following criteria—that the matter is not within defendants' exclusive knowledge, because it could be easily duplicated from other sources such as public records; that the matter may have some relationship to, but is neither crucial to nor bears heavily upon the determination of guilt; that independently of the matter, there was ample evidence upon which the judgment rested; that the matter was part of the normal booking process and usually asked of all persons booked; that the matter was not part of an interrogation designed to elicit inculpatory statements; and that nothing was asked of defendant regarding the commission of the offense charged.

■■ We believe these criteria have been met here. Further, we note that defendants did not question the propriety of any of the other booking questions, the responses to which were also indicative of flight, and it appears to us that the trial court considered flight only as a corollary to other clear and convincing evidence of guilt. (*People v. Watson* (1975), 28 Ill. App. 3d 786, 329 N.E.2d 512.) Thus, we conclude that there was no prejudicial error, and certainly no plain error, in the admission of defendants' responses.

Defendant West next contends that he was deprived of his right to a fair trial when the State was allowed to propound questions, on cross-examination of an alibi witness, which implied the existence of facts which it could not and did not intend to prove by credible evidence. The State asked West's mother if she had seen Roosevelt McCarthy on May 21, 1972, and the trial court sustained an objection thereto. Thereafter, the State asked her if she knew McCarthy, to which she replied in the negative. McCarthy had been listed as a potential witness by defendants but not as an alibi witness. Since this line of questioning consummated in a dead end, implying nothing apparently prejudicial to West's case, we can find neither the abuses exhibited in the cases cited by defendant (*People v. Hawkins* (1975), 61 Ill. 2d 23, 329 N.E.2d 221, and *People v. Pearson* (1972), 2 Ill. App. 3d 861, 277 N.E.2d 544) nor any reason to withhold the application of the presumption that the trial court, acting as the trier of fact, considered only competent evidence (*People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102). The presumption is particularly appropriate where, as here, the trial judge twice specifically stated that his finding of guilt rested upon the clear and convincing evidence of the two occurrence witnesses.

■■ It is also asserted by defendants that they were denied their right to a fair trial because hearsay testimony received for the purpose of the motion to quash was also considered as proof of their guilt. We disagree. To determine whether probable cause for defendants' arrest existed, evidence was received to the effect that persons who were not called to testify had identified defendants. In closing argument, the State referred to these identifications, which defendants urge precludes the application of the presumption that the trial court considered only competent evidence. This argument, however, overlooks the court's statements made at the time it entered the verdicts here and repeated at the denial of the motion for a new trial, which specifically set out the basis of its finding of guilt and made no reference to the hearsay testimony. Moreover, the record is replete with references that the court considered evidence concerning the arrests only in connection with the motion to quash and to suppress. We find the trial court's statement that it relied on the identifications of the *two* occurrence witnesses to be ample support for indulging in the presumption, notwithstanding the improvident argument of the State.

■■ Defendants additionally argue a denial of a fair trial because their examination of the State's witnesses, Donald Monte and Harrison Gray, in support of the motion to suppress the identification, was improperly restricted. We disagree. A review of the record discloses that Monte and Gray were extensively cross-examined regarding their opportunity to observe the lighting conditions which existed during the

occurrence, their descriptions of defendants, the number of times they perused the nine photos and the number of minutes spent in viewing all photographs, and whether they were told that the offenders were in the group of nine. Officer McCabe was also thoroughly questioned concerning the photo identification procedure employed and the details of the descriptions which had been given to him by Monte. Nonetheless, defendants complain that the trial court committed error in sustaining certain of the State's objections. The first involved Monte's misidentification at the preliminary hearing. As the trial court found that identification to be tainted, no prejudice can be found in precluding the defense from pursuing that aspect any further. The second concerned a highly argumentative question which was properly sustained, as it constituted an attempt to place words in the witness's mouth. (*People v. Hubbard* (1973), 55 Ill. 2d 142, 302 N.E.2d 609.) Furthermore, the basis of the question had been covered by other questions. The third query constituted an impermissible fishing expedition (*People v. Malcom* (1973), 14 Ill. App. 3d 378, 302 N.E.2d 352), and in any event the merit of the matter had been explored in other questions which had been allowed. The court's rulings were not reversible error.

We turn now to the seventh contention of defendants that their guilt was not proved beyond a reasonable doubt. The law is well settled that the testimony of a single witness, who had ample opportunity for observation under favorable conditions, if positive and credible is sufficient to support a conviction even though the defense has contradicted the testimony. (*People v. Miller* (1971), 2 Ill. App. 3d 206, 276 N.E.2d 395.) In a bench trial, the credibility of witnesses and the weight to be given their testimony are matters for the determination of the trial court, and a court of review will not substitute its judgment unless the proof is so unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Tillis* (1976), 40 Ill. App. 3d 66, 351 N.E.2d 332.

Our review of the record fails to show the determination of the trial court to have been based upon such unsatisfactory evidence.

Initially, we note that although it is possible that Monte's viewing of his brother as he lay mortally wounded and Gray's lack of identification until two years after the occurrence may have affected their identifications as contended by defendants, the trial court was in a superior position to view their demeanor, and it found them to be credible and candid. We note that Monte detailed several instances where he had an unobstructed view of defendants for a one-minute duration or longer and at distances of a few feet, under good lighting conditions. Thus, the trial court's determination that he had an ample opportunity for observation is well supported by the record. Although State and defense witnesses had

divergent views of how much facial hair located in the area of the chin constituted a goatee, we agree with the trial court's characterization of the controversy as a matter of semantics and a minor discrepancy which did not vitiate their credibility. Regarding Monte's misidentification at the preliminary hearing, we feel the record fully supports the trial court's assessment that in view of his extended opportunity to observe defendants during the occurrence and because his description substantially correlated to the appearance of defendants, his in-court identification had an origin independent of the subsequent misidentification. Moreover, his identification remained unshaken during extensive cross-examination.

■■ It is true, as defendants argue, that the State did not explain why the others present in the store who had identified defendants by name to Officer McCabe based on their prior acquaintanceship, were not called to testify; but it was under no requirement to do so, and the merit of defendants' points of view in this regard was extensively argued and rejected by the trial court—as we also do here. Furthermore, although there are discrepancies in the testimony of Gray and Monte, we are satisfied that no serious conflict exists. We do, however, note the disparity in their testimony as to whether the shot preceded or followed the opening of the cash drawer, but we do not see in this a conflict of the magnitude exemplified in the cases cited by defendants. (*People v. Lonzo* (1974), 20 Ill. App. 3d 721, 315 N.E.2d 256; *People v. Hister* (1974), 20 Ill. App. 3d 933, 314 N.E.2d 562, *aff'd* (1975), 60 Ill. 2d 567, 328 N.E.2d 531.) Therefore, we find the record as a whole amply supports the judgment of guilt beyond a reasonable doubt.

■■ Lastly, defendants argue that the sentences imposed were excessive in light of their ages and backgrounds. They contend that because West was 19 years of age at the time of trial and had no criminal record and Dees was 24 and had only a very minor record, they should have received lighter sentences which would have been commensurate with rehabilitation. We disagree. In *People v. Davis* (1974), 20 Ill. App. 3d 948, 957, 314 N.E.2d 723, 730, it is stated:

> "The power of the reviewing court to disturb a sentence imposed by the trial court should be exercised with caution and circumspection due to the superior position of the trial court, during the course of the trial and of the hearing in aggravation and mitigation, to assess the appropriate punishment. [Citation.]"

In the instant case, the trial court sentenced defendants to terms of 60 to 100 years for participating in the callous murder of a robbery victim who had offered no resistance. In *Davis*, a sentence of 35 to 100 years was imposed upon a 20-year-old defendant with no prior criminal record for his participation in an "execution" type of slaying. In that case, we held

that the sentence was not excessive and that the trial court had not abused its discretion by imposing it. A similar result was reached in *People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 715, 329 N.E.2d 262, 265, where "the clearly deliberate killing of an innocent person after repeated but unsuccessful attempts to frighten him into submitting to a planned robbery" justified a sentence of a greater magnitude than was apparently called for by defendant's background. Thus, it cannot be said that the trial court here, which was in a superior position to determine what penalty should have been imposed, abused its discretion.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.