THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES BUCHANAN, Defendant-Appellant.

First District (5th Division)    No. 79-2202

Opinion filed July 10, 1981.

194

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Noble Nacev, and John R. Ashenden, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the offenses of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2), and was sentenced to concurrent terms of 35 and 30 years imprisonment, respectively. On appeal, defendant raises the following issues: (1) whether the trial court abused its discretion by allowing an unlisted State witness to testify at trial to the identification of defendant and his flight from the crime scene; (2) whether the trial court erred in restricting defense counsel's cross-examination of an accomplice to the crime; and (3) whether defendant was prejudiced by the introduction of rebuttal testimony which constituted collateral and improperly referred to his post-arrest decision to remain silent. The following pertinent evidence was adduced at trial.

On April 25, 1978, at about 10:30 p.m., 16-year-old Debra Mell was in her mother's apartment and was watching television with her brother, Terry Lee. Hearing a "loud knock" at the front door, she walked to the door and asked who was there. The visitor asked for her brother, Terry. She cracked open the door to see who was there, and two men pushed their way into the apartment. One man wore a red ski mask extending to the bottom of his nose, and carried a straight razor. The other was heavy set, wore sunglasses, and held a sawed-off shotgun. The man with the mask grabbed her, cutting her arm with the razor. He then pulled her into

the living room of the apartment where her brother, Terry, was watching television. When her brother attempted to stand up, the masked intruder pushed him down and held the razor to his neck. The heavy set man stood in front of Terry Lee and held the shotgun about three inches from his stomach. At this point, the man with the mask told the other man to "shoot the m_____." He did so. After being shot, her brother attempted to get up, but fell. He begged the man with the shotgun not to shoot him again.

The masked person then walked to the upstairs level of the apartment. He grabbed the victim's mother, Margaret Lee, as she came out of the bathroom, and pressed the razor against her neck. The man demanded her money, but she had none. Margaret Lee's son, Emmett, who had one leg in a cast, emerged from one of the bedrooms on a crutch. He raised his crutch to strike the intruder, but stopped when the latter threatened to cut his mother's throat. The man then dragged the woman down the stairs to the kitchen. Emmett Lee followed.

In the kitchen, the masked man forced Margaret Lee to kneel. Looking up at him, the woman was able to see that he had high cheekbones, a shallow jaw and a goatee. At trial, she identified this man as defendant, who lived in the apartment adjacent to the Lee family for three months prior to the incident. Since she had spoken with defendant on about 30 separate occasions, his voice was familiar to her and matched that of the masked assailant. Emmett Lee, who had also spoken to defendant on previous occasions, corroborated his mother's testimony that this person's voice was that of defendant. The heavy set man with the shotgun, who was standing over the victim, then approached Emmett Lee and placed the shotgun barrel in his mouth. Margaret Lee recognized the gun as belonging to "Honey" Robinson, another neighbor. Then, the man wearing the mask walked over to the wounded Terry Lee, picked up a television set, threw it on top of him and kicked him. After doing this, the man told his companion that there was "a white honky" upstairs in a bedroom. Armed with the shotgun, the heavy set man went upstairs. About one minute later, the other assailant followed.

Upstairs, the man with the shotgun found Larry Tate, who was living with the Lee family, in a bedroom. He demanded money from Tate, who complied by handing over his wallet. The assailant removed about three dollars from the wallet. The masked accomplice then entered, and started rummaging through the drawers in the room. Then, the masked person turned and, according to Tate, "made a mistake." The man looked at Tate, "when he turned on his side," which provided an opportunity to see the assailant's face. Tate observed the man's eyes and chin. The heavy set man, who apparently discovered that Tate recognized his companion, instructed Tate not to look and threatened to kill him if he said anything.

Tate identified the masked person as defendant, the next-door neighbor. After a few moments, the two assailants ran downstairs and out of the apartment carrying a drawer from the bedroom which contained about $5 in pennies.

Meanwhile, downstairs, Margaret Lee remained with her dying son. Earlier, when the intruders left her and the others unguarded, she told her daughter, Debra, and son, Emmett, to leave and call the police. The police arrived shortly thereafter, and took the victim to the hospital.

Steve Robinson, the brother of Honey Robinson, testified that he had originally been charged with the murder of Terry Lee, but the State had agreed to drop those charges and to recommend a four-year sentence for a burglary charge in return for his testimony. He had known defendant, who was married to his sister, for about nine years. On the night of the crime, Steve Robinson met defendant at the latter's apartment, next door to the apartment where the murder took place. There, they discussed plans to "get even" with Terry Lee because of a previous fight between defendant and deceased stemming from an argument over "pills and beer." During the fight, defendant had attempted to shoot Lee, but the gun misfired. Lee and some others jumped on defendant, beat him and took away his gun.

When defendant asked Steve Robinson on the night in question if he knew anyone who would help him fight with the deceased, Robinson said that he did. The two left the apartment and later met with five men who were previously fellow members of the "Unknown Vice Lords." Defendant told the old gang members that some people at the project had been "messing with my mother," and also mentioned that Honey Robinson could supply a sawed-off shotgun. A heavy-set man, who later proved to be the trigger man, suggested that they get the gun. Then, defendant, the heavy set man and Steve Robinson obtained the shotgun from Honey Robinson. When they reached Terry Lee's apartment building, the heavy set man grabbed the shotgun and went up the stairway with defendant and the two Robinson brothers. They paused between the eighth and ninth floors of the building to discuss whom they were "going to get." Defendant suggested Terry Lee's name, but Steve Robinson rejected the idea. A short argument ensued, but then defendant told Steve Robinson, "You stay there. You ain't got no business here noway." Defendant put on a red and orange ski cap which had eye holes razored out of it. The heavy set person turned around his cap and donned sunglasses. All of the men except Honey Robinson then proceeded to the ninth floor.

Defendant knocked on the door to the Lee family's apartment. Steve Robinson stood outside the doorway. When the door opened, defendant and the heavy set man entered the apartment. Shortly thereafter, Steve Robinson heard a shotgun blast. He ran through the hallway to the

stairwell. A short time later, members of the Lee family ran out of the apartment and to the stairway. Afterwards, the two assailants came out. Defendant ran past Steve Robinson carrying a drawer, but the heavy-set man approached Robinson, put the shotgun to his face, then ran down the stairs. When all three men reached the landing between the seventh and eighth floors of the building, defendant removed his mask. Then the men ran out of the building and separated. According to Robinson, defendant wore a blue jean outfit that night and had a moustache and goatee.

David Simmons testified that he was a resident of the apartment building. At about 10:30 on the night in question, he was walking up the stairs on his way to the ninth floor to visit Terry Lee. At the sixth floor, Simmons saw defendant coming down the stairs wearing blue pants and a "red skull cap" which extended down to his forehead. When he saw defendant, he ran, since he believed that defendant was running after him. Two weeks earlier, Simmons and Terry Lee had been in the fight with defendant over drugs and beer. After the fight, defendant vowed to kill Simmons and the deceased.

Defendant was the sole defense witness. He testified that he knew Terry Lee had been killed, but that he did not kill him. On the evening of April 25, 1978, he was not at the Lee family's apartment, and could not recall where he was. Defendant admitted having a fight with Terry Lee a few weeks before the night Lee was murdered, but stated that David Simmons was not involved. In fact, defendant had never seen Simmons before he testified. Seven or eight months after the crime occurred, defendant was arrested. On cross-examination, he denied talking to Assistant State's Attorney Michael Ward at the time of his arrest, and stated that he did not remember whether he denied knowing his wife or Steve Robinson.

On rebuttal, Assistant State's Attorney Michael Ward testified that he was present at the police station on the night that defendant was arrested. According to Ward, during his interview with defendant, he denied knowing his wife, Leona Robinson, or his brother-in-law, Steve Robinson.

OPINION

Defendant first contends that the trial court abused its discretion in allowing David Simmons to testify at trial.

After jury selection had been completed and testimony was taken from a number of witnesses, an Assistant State's Attorney informed the trial court that the victim's family came to his office that afternoon and introduced him to David Simmons for the first time. The trial court investigated whether there was actual knowledge on the State's part as to Simmons' existence, and whether the State exercised due diligence in the preparation of its case. After an extended discussion of the issue, the court

found that the State had no actual or constructive knowledge of the witness and permitted the State to amend its answer to discovery to include Simmons. Defense counsel was allowed to interview the witness in the presence of a court reporter, but declined the court's offer to continue the case in order to search for alibi witnesses.

■■ The purpose of requiring the State to furnish a list of prosecution witnesses is to prevent surprise and afford an opportunity to combat false testimony. (*People v. Anderson* (1977), 46 Ill. App. 3d 607, 360 N.E.2d 1371.) The trial court has discretion to allow a witness whose name is not furnished to defendant to testify and in the absence of a showing of surprise or prejudice to defendant, there is no error in allowing the unlisted witness' testimony. (*People v. Kirkwood* (1980), 82 Ill. App. 3d 252, 402 N.E.2d 677.) Surprise or prejudice is not established where defendant has failed to take advantage of an opportunity to seek a continuance for preparation purposes. *People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.

■■ In this case, defendant argues that he was prejudiced by Simmons' testimony in two ways: (1) defense counsel would have worked "a little bit harder" to search for alibi witnesses had he known of Simmons' existence before trial, and (2) defendant lost the opportunity to cross-examine the deceased's family members (who had already testified), about their relationship with Simmons. As to the first assertion, we note that defendant did not avail himself of the opportunity of a continuance in order to search for witnesses to refute Simmons' expected testimony. Therefore, he cannot now claim that he was prejudiced by the admission of this testimony. (*Dees.*) Defendant's second argument is equally without merit. Basically, defendant maintains that he would have cross-examined Margaret Lee, Emmett Lee and Debra Mell as to their relationship with Simmons in the hopes of casting doubt on his credibility, if defendant had known prior to trial that Simmons would testify.

Defendant, however, had the opportunity to request the trial court to recall Lee's family members for the purpose of further cross-examination in this area (see, *e.g., People v. Sanders* (1972), 5 Ill. App. 3d 89, 282 N.E.2d 742), but failed to do so. In addition, defense counsel did, in fact, cross-examine Simmons as to his relationship with Lee and the defendant. Therefore, since the State had no knowledge of this witness prior to trial, and defendant suffered no prejudice, we find that the trial court did not abuse its discretion in allowing Simmons to testify.

Defendant next contends that the trial court erroneously restricted his cross-examination of Steve Robinson. During cross-examination, the defense sought to inquire into Robinson's relationship with the deceased to establish that he would have a motive to take an active part in the killing. However, the court sustained objections to questions concerning

Robinson's feelings about the deceased and his knowledge of whether or not his sister had been beaten by the deceased. By these questions, the defense attempted to raise the question of whether Robinson, and not defendant, was the masked man who entered the apartment.

■■■ The purpose of cross-examination is to introduce matters which explain, modify or discredit any of the evidence introduced on direct examination. (*People v. Lewis* (1974), 18 Ill. App. 3d 281, 309 N.E.2d 784.) The trial court is vested with wide discretion in the manner and scope of cross-examination, and only a clear abuse of discretion will warrant our interference. (*People v. Nowak* (1979), 76 Ill. App. 3d 472, 395 N.E.2d 28.) There was no evidence in the present case that Robinson ever entered the apartment on the night Terry Lee was shot. The evidence clearly revealed that he was in the hallway outside the apartment at the time of the shooting. In addition, witnesses to the crime positively identified defendant as the intruder wearing the mask that night. Hence, evidence of Robinson's motive to shoot the deceased was irrelevant, and the trial court acted within its discretion in sustaining objections to defense questions in this area. Furthermore, defense counsel was later allowed to ask Robinson whether he was the person wearing the mask on the night of the crime, and whether he wanted to kill the deceased since he was a friend of the man that beat up Robinson's sister. Therefore, the trial court allowed the defense to elicit the very testimony that he now contends was restricted.

Finally, defendant contends that he was prejudiced by the introduction of collateral impeachment from the State's rebuttal witness. More specifically, defendant alleges as improper the testimony of Assistant State's Attorney Ward, who stated that defendant, upon his arrest, denied knowing his wife or Steve Robinson. Defendant had testified on cross-examination that he did not remember telling the police or a State's Attorney anything, and stated: "As far as I'm concerned, I didn't tell them nothing. I didn't say nothing."

■■ Rebuttal evidence is that which explains, repels, contradicts, or disproves evidence produced by the accused. (*People v. Plair* (1977), 51 Ill. App. 3d 75, 366 N.E.2d 410.) While rebuttal evidence may properly contradict the defendant's testimony on a material issue, it is improper as to collateral matters. (*People v. Allen* (1975), 27 Ill. App. 3d 1054, 327 N.E.2d 387.) Our supreme court has explained the rule barring collateral matters as follows:

> " 'The rule is that a witness may be impeached by showing that he has made contradictory statements, but he cannot be thus impeached as to collateral matters. "Since the reason of the rule excludes witnesses whose testimony would introduce new issues over and above those which already might be entered into, the test of collateralness should naturally be, could the fact for which they

are offered in contradiction have been shown in evidence for any purpose independently of this contradiction?" [Citations.] * * *' " *People v. Steptore* (1972), 51 Ill. 2d 208, 216-217, 281 N.E.2d 642, 646 (citing *People v. Pfanschmidt* (1914), 262 Ill. 411).

■■ The question then becomes whether the rebuttal testimony at issue could have been introduced into evidence for a purpose independent of its mere contradictory effect, or whether it was, indeed, collateral and inadmissible. At trial, there was no issue as to whether defendant was related to Steve Robinson, his brother-in-law, or Leona Robinson, his wife. The only pertinent issue was whether defendant was a participant in the murder of Terry Lee on the night in question. In addition, defendant offered no testimony as to any conversation with the authorities after his arrest. Evidence of this conversation was only evoked during the State's cross-examination. Based upon the foregoing, we fail to see how the rebuttal testimony could have been offered for a material purpose in defendant's prosecution independent of its alleged impeaching design. The State maintains that the rebuttal evidence was relevant because it tended to show evidence of defendant's guilty knowledge of the crime. While it is proper to prove the facts and circumstances attendant upon the arrest of a defendant for the crime for which he is being tried where such facts and circumstances logically tend to connect him with the perpetration of the crime (*People v. Gallina* (1929), 335 Ill. 270, 166 N.E. 924), we believe the evidence offered in this case had no such tendency. Defendant's testimony on cross-examination concerning his actions upon his arrest reveals to us nothing more than his lack of willingness to speak to or cooperate with the authorities. Rebuttal testimony on this topic was not probative in the determination of defendant's guilt or innocence. Even though the evidence was erroneously admitted, however, we find that it did not unduly prejudice defendant and does not warrant reversal of his conviction. See *People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212.

Defendant contends that the State's rebuttal testimony was also prejudicial since it contained a comment on defendant's post-arrest decision to remain silent and to have counsel present.

During the cross-examination of Assistant State's Attorney Ward, defense counsel repeatedly questioned Ward as to his decision at the police station to stop interrogating defendant, in an apparent effort to convey to the jury that the State believed that defendant was not a viable suspect at that juncture of the investigation. Ward responded by stating that after defendant had made a statement indicating he did not wish to answer any more questions, the interrogation ceased.

■■ Prior to redirect examination, the State informed the trial court at a sidebar conference that they intended to ask Ward what defendant said to

him that prompted the termination of questions. The State wished to elicit from Ward that defendant had requested an attorney and refused to answer any other questions until one was secured. The trial court allowed the State to adduce this testimony over defense objection, since defense counsel's cross-examination of Ward had raised an issue as to the motivation of Ward in ceasing the interrogation. The court then admonished the jury that this testimony was only to be considered for the purpose of explaining why Ward stopped his questioning and could not be considered as evidence of defendant's guilt.

Defendant now maintains that this testimony constitutes an improper comment on defendant's right to remain silent upon his arrest in violation of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.

In *Doyle*, the United States Supreme Court held that defendant was denied due process when he was cross-examined at trial concerning his earlier failure to relate to the police the exculpatory story that was offered for the first time at trial. This holding was based upon the fundamental unfairness inherent in using an arrestee's silence to impeach an explanation subsequently offered at trial, after the arrestee was induced to rely on his right to remain silent by way of *Miranda* admonishments.

■■■ *Doyle*, of course, differs from the factual situation here, where no attempt was made to impeach defendant's trial testimony with his previous silence. The reference to defendant's silence in this case was introduced not through cross-examination of defendant, but by way of redirect examination of a State witness. More importantly, however, the testimony concerning defendant's decision to remain silent was only elicited by the prosecution in response to several questions posed to Ward by the defense on cross-examination concerning his motivations for terminating the questioning of defendant. It is fundamental that a defendant cannot provoke a reply to his own improper conduct and subsequently claim error. (*People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19; *People v. Upshire* (1978), 62 Ill. App. 3d 248, 379 N.E.2d 38.) In this case, the State witness' reference to defendant's decision to remain silent was clearly provoked by the line of questioning employed by defense counsel on cross-examination and was therefore proper. Moreover, the trial court's timely admonishment informing the jury that the testimony could not create an inference of defendant's guilt sufficiently insured that no prejudice would result from this testimony.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.